CITY OF GARY, Indiana, by its May-
or, Scott L. KING, Appellant
(Plaintiff below),

v.

SMITH & WESSON CORP., et al.,
Appellees (Defendants below).

No. 45S03–0301–CV–36.

Supreme Court of Indiana.

Dec. 23, 2003.

1224

James B. Meyer, Lukas I. Cohen, W. Anthony Walker, Gary, IN, Dennis A. Henigan, Brian J. Siebel, Daniel R. Vice, Washington, DC, Attorneys for Appellant.

James P. Dorr, Sarah L. Olson, Chicago, IL, Terence M. Austgen, Elizabeth M. Bezak, Munster, IN, Kenneth D. Reed, John P. Reed, Hammond, IN, John E. Hughes, Merrillville, IN, Stephen E. Scheele Highland, IN, Ihor A. Woloshanski, Merrillville, IN, Attorneys for Appellees.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF AP-PEALS, NO. 45A03–0105–CV–155.

BOEHM, Justice.

The City of Gary sued for injunctive relief and money damages for the harm it alleges is caused by the unlawful marketing and distribution of handguns. The City alleges claims for public nuisance and negligence against manufacturers, wholesalers, and distributors of these products. We hold that the City's complaint states a claim against certain sales practices of all defendants. We also hold that the City's negligent design claim states a claim against the manufacturer-defendants.

**Factual and Procedural Background**

In September 1999, the City filed this action in state court against a number of participants at various stages in the manufacture and distribution of handguns. After an amended complaint disposed of some defendants, the remaining named defendants are eleven manufacturers,[1] one

---

1. Smith & Wesson Corp., Beretta U.S.A. Corp., Glock Corp., Charter Arms Corp., Hi-Point Firearms Corp., Navegar, Inc. d/b/a Intratec U.S.A. Corp., Bryco Arms Corp., Phoe- nix Arms Corp., Lorcin Engineering Corp., Sturm, Ruger & Co. Corp., and Taurus Firearms Corp.

wholesaler,[2] and five retailers.[3] The City has also named multiple John Doe defendants in all three categories.

The complaint alleges that manufacturers of handguns typically sell to "distributors" who resell at wholesale to "dealers" who in turn sell at retail to the general public. Some categories of persons are prohibited by law from purchasing guns, and all dealer-defendants are alleged to have knowingly sold to illegal buyers through intermediaries in "straw purchases". Specifically, three dealers, Cash America, Ameri–Pawn, and Blythe's Sporting Goods, are alleged to have engaged in straw purchases that were the subject of a "sting" operation conducted by the Gary police department against suspected violators of the gun distribution laws. The police employed a variety of techniques in these operations. In general, an undercover officer first told a dealer's salesperson that he could not lawfully purchase a gun, for example, because he had no license or had been convicted of a felony, and a second undercover officer then made a purchase with the clerk's knowledge that the gun would be given to the first. Some other practices of dealers are also alleged to generate illegal purchases. These include failure by some dealers to obtain the required information for background checks required by federal law, sales of a number of guns to the same person, and intentional "diversion" of guns by some dealers to illegal purchasers.

The City alleges that the manufacturers know of these illegal retail sales of handguns, and know that a small percentage of dealers, including the dealer-defendants here, account for a large portion of illegally obtained handguns. The City alleges

the manufacturers and distributors have the ability to change the distribution system to prevent these unlawful sales but have intentionally failed to do so.

The City alleges that these and other practices generate substantial additional cost to the public in general and the City in particular. Possession of unlawfully purchased guns is claimed to contribute to crime that requires expenditure of public resources in addition to the obvious harm to the victims. The complaint alleges that seventy murders with handguns took place in Gary in 1997, and another fifty-four in 1998. From 1997 through 2000, 2,136 handguns used in crimes were recovered. Of these, 764 were sold through dealers who are defendants in this suit. The City also asserts that harm is suffered by the City at the time of the sale of an illegal handgun because these unlawful sales generate additional requirements to investigate and prosecute the violations of law.

In addition to challenging the distribution practice of the defendants, the City also alleges negligent design of the handguns by the manufacturers that contributes to these injuries. Finally, the City alleges that the manufacturers engage in deceptive advertising of their product by asserting that a gun in the home offers additional safety for the occupants when in fact the contrary is the case.

▪ Count I of the complaint alleges that these facts support a claim for public nuisance. Count II asserts a claim for negligence in distribution of guns and Count III presents a claim for their negligent design. All Counts request compensatory and punitive damages and injunctive relief. The trial court granted a

**2.** B.L. Jennings, Inc.

**3.** Ameri–Pawn of Lake Station, Inc.; Blythe[']s Sport Shop, Inc.; Cash Indiana, Inc.; Jim Shema's Outdoor Sports; and Westforth Sports, Inc.

motion by all defendants to dismiss both counts for failure to state a claim.[4] The City appealed and the Court of Appeals affirmed the dismissal of the negligence count as to all defendants. Dismissal of the claim for public nuisance was affirmed as to the manufacturers and distributors, but the Court of Appeals concluded that the complaint stated a claim for public nuisance as to the dealers to the extent it alleged that they engaged in "straw purchases." *City of Gary v. Smith & Wesson Corp.*, 776 N.E.2d 368, 389 (Ind.Ct.App.2002). We granted transfer.

The standard of review for a motion to dismiss is well settled. A complaint may not be dismissed for failure to state a claim unless it is clear on the face of the complaint that the complaining party is not entitled to relief. *City of New Haven v. Reichhart*, 748 N.E.2d 374, 377 (Ind.2001). Because this comes to us as a review of a dismissal of the City's complaint for failure to state a claim, we accept the allegations of the complaint as true for purposes of this motion. It remains for trial whether the City can establish the facts it alleges. We view the pleadings in the light most favorable to the City as the nonmoving party and draw every reasonable inference in favor of it. *Id.*

## I. Public Nuisance

The City asserts that public nuisance is an independent cause of action and that any business unreasonably and unnecessarily operating in a dangerous manner can constitute a nuisance. It contends that its allegations against the defendants meet that standard.

### A. Public Nuisance as an Unreasonable Interference with a Public Right

The essence of the City's claim is that handgun manufacturers, distributors, and dealers conduct their business in a manner that unreasonably interferes with public rights in the City of Gary, and therefore have created a public nuisance. In addressing this contention all parties to the lawsuit look to the Restatement (Second) of Torts section 821B, which defines a public nuisance as "an unreasonable interference with a right common to the general public." Indiana nuisance law is grounded in a statute enacted in 1881, and now appearing at Indiana Code section 32–30–6–6.[5] It reads:

Whatever is:

(1) injurious to health;

(2) indecent;

(3) offensive to the senses; or

(4) an obstruction to the free use of property;

so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action.

The Indiana statute, unlike the Restatement and most common law formulations of public nuisance, makes no explicit mention of the "reasonableness" of the conduct that is alleged to constitute a nuisance.

---

4. Blythe's Sport Shop, Inc., and Jack's Loan, Inc., contend that the plaintiff's First Amended Complaint effected no amendment and therefore was merely an effort to extend the time for appealing the order of dismissal. These defendants themselves point out no fewer than nine differences between the two complaints. The trial court allowed the amendment. That is sufficient to constitute an amended complaint. *Templin v. Fobes*, 617 N.E.2d 541, 543 (Ind.1993).

5. The nuisance statute was first codified as Indiana Code section 34–1–52–1. In 1998 the statute was recodified to appear at 34–19–1–1, and it was again recodified in 2002 as 32–30–6–6.

However, the language of the statute is very broad, and if read literally would create a cause of action for many activities not actionable as nuisances at common law and not generally viewed as improper even though they produce, at least to some extent, one or more of the effects listed in the statute. In recognition of this practical reality, over the intervening 122 years, Indiana courts have consistently referred to the common law reasonableness standard in applying the Indiana nuisance statute. Indeed, in 1881, the year of the statute's enactment, this Court referred to the need to avoid "unnecessary" inconvenience or annoyance to others. *Owen v. Phillips*, 73 Ind. 284 (1881), was a private nuisance case by adjoining property owners seeking to have a mill declared a nuisance. This Court pointed out the need to balance the usefulness of the activity against the harm to others in evaluating a claim of nuisance:

> We approve, in its fullest extent, the doctrine, that in some localities a business will be considered a nuisance, while it would not be so in others. But wherever the mill or factory may be located, whatever its surroundings, property owners of the vicinity have a right to require that it shall be properly managed, conducted with ordinary care and proper regard for the rights of others, and in such a way as that no unneces-

sary inconvenience or annoyance shall be caused them.

*Id.* at 295–96.

More recently, in addressing a nuisance claim based on an alleged hazardous use of real property, this Court adopted a more modern formulation of essentially the same concept. A public nuisance was described as an activity "reasonably and naturally calculated to injure the general public":

> Not every dangerous agency is a nuisance, and we believe it can be said generally that an instrumentality maintained upon private premises may only be said to be a nuisance upon the ground that it is calculated to produce personal injuries when it is of such character, and so maintained, that it is reasonably and naturally calculated to injure the general public or strangers who may come upon the premises.

*Town of Kirklin v. Everman*, 217 Ind. 683, 688, 28 N.E.2d 73, 75 (1940). In addition, several Indiana Court of Appeals decisions, including that of the Court of Appeals in this case, have adopted the Restatement's formulation of a nuisance as an "unreasonable" interference with common or public rights.[6]

▇ Despite the statute's absolutist approach, all parties to this lawsuit have couched their arguments in terms of the reasonableness of the defendant's conduct. Given this consistent interpretation of a

---

6. In *Hopper v. Colonial Motel Properties*, 762 N.E.2d 181, 184 (Ind.Ct.App.2002), a guest in a motel was injured when the patron in the room above accidentally discharged a gun. The Court of Appeals affirmed the trial court's dismissal of the nuisance claim against the hotel because the operation of a hotel would not reasonably or normally lead to gunshot injuries to a guest. *Id.* at 187. In *Indiana Limestone Co. v. Staggs*, 672 N.E.2d 1377, 1379 (Ind.Ct.App.1996), an estate sued a limestone quarry after a driver of a car failed to negotiate a curve in the road and drowned in

the quarry claiming, inter alia, the quarry constituted a public nuisance. The Court of Appeals affirmed the dismissal because although the plaintiff provided evidence that other quarries were a public nuisance, there was no showing that the quarry involved in the accident unreasonably interfered with the public's use of the highway. *Id.* at 1384. *See also Sand Creek Partners, L.P. v. Finch*, 647 N.E.2d 1149, 1151 (Ind.Ct.App.1995); *Blair v. Anderson*, 570 N.E.2d 1337, 1339 (Ind.Ct. App.1991).

statute long on the books, we reaffirm that a nuisance claim is, as the Restatement says, predicated on unreasonable interference with a public right. "Reasonableness" in evaluating a nuisance claim appears to have been used by Indiana courts in two related but facially different senses. Defining a nuisance as conduct "reasonably calculated to injure" seems to focus on the predictability of resulting injury. "Reasonable" conduct, on the other hand, focuses on the activity claimed to constitute a nuisance. The formulation of the Restatement seems consistent with the first view, by looking to the resulting injury to the public as the test of "unreasonable" interference. Comment (e) to the Restatement section 821B defines an unreasonable interference: "the defendant is held liable for a public nuisance if his interference with the public right was intentional or was unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct or for abnormally dangerous activities.... If the interference with the public right is intentional, it must also be unreasonable." Restatement (Second) of Torts § 821B cmt. e.

■ We think this boils down to the same question for the trier of fact framed by *Owen* over a century ago: a nuisance is an activity that generates injury or inconvenience to others that is both sufficiently grave and sufficiently foreseeable that it renders it unreasonable to proceed at least without compensation to those that are harmed. Whether it is unreasonable turns on whether the activity, even if lawful, can be expected to impose such costs or inconvenience on others that those costs should be borne by the generator of the activity, or the activity must be stopped or modified. W. Page Keeton, *Prosser and Keeton on The Law of Torts* § 88 at 629–30 (5th ed.1984). And of course the same

activity may constitute a nuisance in some contexts, but be acceptable in others where its adverse effects are not sufficient to require a remedy.

## B. *The City's Public Nuisance Claim*

■ The City alleges that the manufacturers, distributors, and dealers knowingly participate in a distribution system that unnecessarily and sometimes even intentionally provides guns to criminals, juveniles, and others who may not lawfully purchase them. Specifically, the City asserts that "[d]efendants affirmatively rely upon the reasonably foreseeable laxness of dealers, and employees, and the ingenuity of criminals to ensure that thousands of handguns find their way into their expected place in the illegal secondary market."

The defendants first contend that the lawful distribution of their products cannot constitute a public nuisance. The manufacturers point out, correctly, that "in every one of over 1,000 Indiana state court and 50 federal public nuisance decisions" courts have recognized public nuisance claims only in two circumstances. Either a statute is violated, or the nuisance stems from use of real property. A variation on this argument is the contention advanced by one retailer that an independent tort must be pleaded to support a public nuisance claim. From this the defendants infer that it is a requirement of a public nuisance action that the claim be based on either misuse of real property or unlawful conduct in the form of either a violation of a statute or an independent tort. The use of real property is not at issue here as to the manufacturers and distributors. The only question, at least as to those defendants, is whether a statutory violation or an underlying tort is required in order to assert a public nuisance claim. The defendants contend that there is no underlying tort here, and also argue that their con-

duct is legislatively authorized and therefore cannot be a public nuisance. The defendants further contend that even if a public nuisance action could survive, they do not have sufficient control over the handguns at the time of the injury to be liable for harm from their misuse. Similarly, the manufacturers and distributors disclaim control over any unlawful sales and therefore deny liability for any harm generated by the sale of a weapon.[7]

Courts have divided on the same or very similar issues under the laws of several other states.[8] For the reason explained below, we conclude that a public nuisance has been alleged under Indiana law and the City is a proper party to assert that claim.

### 1. *Unlawful Activity or Use of Land as a Prerequisite for Nuisance*

■ We are not persuaded that a public nuisance necessarily involves either an unlawful activity or the use of land. Defendants cite no Indiana case that establishes this requirement, but point out that all Indiana cases to date have fallen into one of these two categories. We think that is due to the happenstance of how the particular public nuisance actions arose and not to any principle of law. The Court of Appeals reached a similar conclusion in rejecting the contention that a party must be the owner or controller of property to be held liable for a nuisance: "[a]lthough most nuisance cases refer to the controversy as being between two landowners, it is because this is the norm, not because the law requires either party to be a landowner." *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49, 53 (Ind.Ct.App.1993) (citations omitted). The court went on to point out that the nuisance statute:

> uses the broad term "whatever" to define the possible sources of a nuisance and it does not contain any reference to property ownership by the party creating the nuisance. This indicates the focus of the legislature was on protecting an individual's right to enjoy property from infringement by any source. We hold that the party which causes a nuisance can be held liable, regardless of whether the party owns or possesses the property on which the nuisance originates.

*Id.* at 53. The same reasoning applies to the claim that use of real estate or conduct of an unlawful activity is a prerequisite of

---

**7.** The manufacturer-defendants addressed all issues presented on appeal, except the admissibility of the settlement agreement. No distributor defendant filed a brief, and of the dealer defendants, Blythe's Sport Shop and Jack's Loan, Inc., filed one brief and Cash Indiana, Inc., filed a separate brief addressing only the issue of whether the City is attempting to regulate guns in violation of Indiana statutes, but also incorporating the briefs of the other defendants.

**8.** *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 419 (3d Cir.2002); *Camden County Bd. of Chosen Freeholders v. Beretta*, 273 F.3d 536, 538 (3d Cir.2001); *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98, 133 (2001); *People v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 761 N.Y.S.2d 192, 194 (N.Y.App.Div.2003) (*appeal denied*); all af-

firmed a dismissal of a public nuisance action. *White v. Smith & Wesson*, 97 F.Supp.2d 816, 819 (N.D.Ohio 2000); *Sills v. Smith & Wesson Corp.*, No. 99C-09-283-FSS, 2000 WL 33113806, 2000 Del.Super. LEXIS 444 (Del.Super.Ct. Dec. 1, 2000); *City of Chicago v. Beretta U.S.A. Corp.*, 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16, 31 (2002) *appeal granted*, 203 Ill.2d 544, 273 Ill.Dec. 136, 788 N.E.2d 727 (2003); *City of Boston v. Smith Wesson, Corp.*, No.1999-02590, 2000 WL 1473568, 2000 Mass.Super. LEXIS 352, (Mass.Super.Ct. July 13, 2000); *James v. Arms Tech. Inc.*, 359 N.J.Super. 291, 820 A.2d 27 (App.Div.2003); and *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, 1151 (2002) allowed a nuisance action to proceed.

a public nuisance. The fact that public nuisance has never been applied to situations other than those involving real property or an unlawful activity does not mean it cannot arise in other contexts.

The Restatement also supports the view that neither real estate nor unlawful conduct is a requirement of a public nuisance claim. It is explicit that "unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts § 821B, cmt h (1977). The requirement that a public nuisance arise from unlawful conduct is found in subsection (b) of Restatement (Second) section 821B(2). But subsection (b) is only one of three circumstances that may give rise to a public nuisance. Restatement (Second) section 821B, reads in full:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Subsection (a) acknowledges that a nuisance may arise from a "significant interference" with public health, safety or convenience. Subsection (c) recognizes that a predictable "significant effect upon the public right" may constitute a nuisance. The three subsections are plainly alternative means of imposing an "unreasonable interference," and the limitations of subsection (b) do not apply to either subsection (a) or (c).

In sum, neither the language of the Indiana statute nor the standard case law formulation of public nuisance places those limits on the doctrine. Indeed, courts in this state and elsewhere have typically rejected any such requirement. Accordingly, we hold that there is no requirement that the activity involve an unlawful activity or use of land. If an activity meets the requirements of an unreasonable interference with a public right, it may constitute a public nuisance.

Other jurisdictions have reached similar conclusions in the context of handgun cases. In *City of Cincinnati*, the Ohio Supreme Court noted "although we have often applied public nuisance law to actions connected to real property or to statutory or regulatory violations involving public health or safety, we have never held that public nuisance law is strictly limited to these types of actions." *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142 (2002) (citation omitted). The court in *City of Chicago v. Beretta U.S.A. Corp.*, noted common law public nuisance is "not limited to those activities the legislature has declared [to be] public nuisances." 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16, 27 (2002) (brackets in original) (*quoting Young v. Bryco Arms*, 327 Ill.App.3d 948, 262 Ill. Dec. 175, 765 N.E.2d 1, 17 (2001)). *See also City of Chicago v. Festival Theatre Corp.*, 91 Ill.2d 295, 63 Ill.Dec. 421, 438 N.E.2d 159, 162 (1982). *But see City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir.2002).

■ We also conclude that a public nuisance may exist without an underlying independent tort, although some elements of the two may be indistinguishable in practical terms, as the allegations of this complaint demonstrate. Here the complaint does allege negligence and resulting predicable injury. But a nuisance claim may be predicated on a lawful activity conducted in such a manner that it imposes costs on others.[9] This is the case whether the actor intends the adverse consequences or merely is charged with knowledge of the reasonably predictable harm to others. In either case, the law of public nuisance is best viewed as shifting the resulting cost from the general public to the party who creates it. If the marketplace values the product sufficiently to accept that cost, the manufacturer can price it into the product. If the manufacturers and users of the offending activity conclude that the activity is not worthwhile after absorbing these costs, that is their choice. In either case, there is no injustice in requiring the activity to tailor itself to accept the costs imposed on others or cease generating them. Finally, as *City of Chicago* noted "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." *City of Chicago,* 271 Ill.Dec. 365, 785 N.E.2d at 29 (*quoting City of Bloomington v. Westinghouse Elec.*

*Corp.,* 891 F.2d 611, 614 n. 5 (7th Cir.1989) (applying Indiana law)).

2. *Compliance with Regulatory Statutes as a Defense*

■ The Court of Appeals held that legislative authorization of the defendants activities served as an affirmative defense to any public nuisance claim and insulated the defendants from liability for a harmful activity. *City of Gary,* 776 N.E.2d at 379, n. 4. We disagree. Presumably the legislative authorization to which the Court of Appeals referred is found either in Indiana Code sections 35–47–2.5–1 through 15, dealing with the sale of handguns, or Article I, Section 32 of the Indiana Constitution, which gives Indiana citizens the right to bear arms in defense of themselves and others. *See Kellogg v. City of Gary,* 562 N.E.2d 685, 694 (Ind.1990). But as established in Part A, an activity can be lawful and still be conducted in an unreasonable manner so as to constitute a nuisance. The Indiana statutes detail the procedure to be used by a dealer in every handgun transaction involving background checks and furnishing information on gun purchasers to the state police. Intentional failure to observe a statutory standard is presumptively unreasonable.[10] Indeed, the doctrine has been specifically applied to unlawful gun sales. Over a decade ago the Court of Appeals held that sales in violation of gun registration laws are negli-

---

**9.** Nuisances may arise from a lawful activity. Our Court of Appeals has held that "[w]hile the keeping of hogs, being a lawful enterprise, cannot be characterized as an absolute nuisance or a nuisance, per se, such an activity can become a nuisance per accidents by reason of the manner in which the hogs are kept, the locality or both." *Yeager & Sullivan, Inc. v. O'Neill,* 163 Ind.App. 466, 474, 324 N.E.2d 846, 852 (1975) (citations omitted). *See also Cox v. Schlachter,* 147 Ind.App. 530, 537, 262 N.E.2d 550, 554 (1970) (the lawful raising of mice).

**10.** A dealer may not sell a handgun until (1) the potential buyer has agreed in writing to a criminal background check; (2) the dealer must provide the buyer's personal information including name, birth date, and social security number to the state police; and request criminal history information from the state police. I.C. § 35–47–2.5–3 (1998). The dealer must also obtain proper identification of the purchaser, including a current address. I.C. § 35–47–2.5–5.

gence per se for which the seller may be civilly liable. *Rubin v. Johnson,* 550 N.E.2d 324, 329 (Ind.Ct.App.1990). Some of the activity alleged in the complaint presumably violates those regulatory statutes, either directly in the case of the dealers or as knowing accomplices in the case of the other defendants.

 More generally, gun regulatory laws leave room for the defendants to be in compliance with those regulations while still acting unreasonably and creating a public nuisance. As the court in *AcuSport* recently pointed out, "[t]he fact that conduct is otherwise lawful is no defense where ... the actions or failures to act of multiple defendants creating in the aggregate a public nuisance can justify liability...." *NAACP v. AcuSport, Inc.,* 271 F.Supp.2d 435, 482 (E.D.N.Y.2003). The essence of a nuisance claim is the foreseeable harm unreasonably created by the defendants' conduct. In any event, the City alleges that the defendants, though subject to regulatory schemes, either directly or as accomplices, are not in compliance with applicable laws. The City has alleged that (1) dealers engage in illegal sales, and (2) the distributors and manufacturers know of their practice and have it within their power to curtail them but do not do so for profit reasons. More specifically, the City claims that manufacturers are on notice of the concentration of illegal handgun sales in a small percentage of dealers, and the ability to control distribution through these dealers, but continue to facilitate unlawful sales by failing to curtail supply. The City also alleges substantial and ongoing human and financial harm from these unlawful sales. These allegations state a claim.

### 3. Due Process Limitations

 The manufacturers and distributors are all located outside the City,

and indeed outside Indiana. They argue that the relief sought by the City's lawsuit would violate the Due Process Clause by imposing extraterritorial regulation and imposing sanctions on conduct outside the City and outside Indiana. It is well established that a state may assert jurisdiction over activity that is conducted outside the state, but has its effects within the jurisdiction. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The defendant's challenge is not lack of personal jurisdiction, but rather that the form of relief the City seeks amounts to an attempt to control activity in another state through Indiana state tort law. *BMW of N. Am. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), addressed that issue. In that case an Alabama state court had awarded punitive damages based on the nationwide activities of the defendant. *Id.* at 565, 116 S.Ct. 1589. The Supreme Court held that due process precluded a single state from seeking to change a tortfeasor's conduct in other states. *Id.* at 572, 116 S.Ct. 1589. At the same time, the Supreme Court observed that "[n]o one doubts that a State may protect its citizens by prohibiting deceptive trade practices.... But the States need not, and in fact do not, provide such protection in a uniform manner." *Id.* 568–69, 116 S.Ct. 1589. The Court went on to observe that both statutory schemes and judicially recognized tort principles are appropriate means to these ends. *Id.* at 569, 116 S.Ct. 1589.

As the Supreme Court put the principles established in *BMW* in a nutshell: "Alabama may insist that BMW adhere to a particular disclosure policy in that State. Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its residents. Nor may Alabama impose sanctions on BMW

in order to deter conduct that is lawful in other jurisdictions." *Id.* at 572–73, 116 S.Ct. 1589. The City here seeks none of the things *BMW* prohibited. It alleges among other things that the manufacturers engage in deceptive advertising aimed at Gary residents. The City also claims that the defendant's conduct produces ongoing and severe "impacts" on Gary and its residents that take the form of injuries to its citizens and harm to the City both in terms of public safety and in financial terms. Nor does the City seek damages for effects outside the City of Gary. To the contrary, the harms it alleges are all within its boundaries.

Finally, the defendants contend that the only available relief would effect changes in nationwide distribution systems and therefore the City's remedy would both regulate conduct outside the state and seek to deter activity in jurisdictions other than Indiana. The City contends that remedies are available for the harm it alleges in Gary without unduly burdening activity elsewhere. At this stage of the lawsuit this issue is easily resolved. The availability of an appropriate remedy turns on factual assertions by both sides that are resolved in favor of the plaintiff on this motion to dismiss.

### 4. *Commerce Clause Limitations on State Tort Law*

█ The trial court concluded that granting relief to the City would violate the Commerce Clause of the federal constitution. The manufacturer-defendants assert that because the City seeks to prohibit some sales practices, for example sales at gun shows or multiple sales to the same purchaser, this lawsuit constitutes an attempt to regulate firearms through the courts. Defendants cite *BMW* for their contention that state tort law can be viewed as regulation of interstate commerce. *BMW* noted that state judicial doctrine may be viewed as "regulation," but held the Alabama punitive damages award in that case to violate Fourteenth Amendment due process. We recognize that some have viewed *BMW* as grounded in the Commerce Clause.[11] But as explained above, the reasons given by the Supreme Court in vacating the Alabama award relate not to state interference with interstate transactions, but rather to Alabama's effort to deter or punish conduct in other states. As such we think *BMW* is a due process case, not a Commerce Clause case. The activities of the manufacturers that the City seeks to curtail are all directed at the effects on local activities by dealers. Accordingly, we think *BMW* does not support the defendants' Commerce Clause contention.

█ Whether a particular state remedy rises to the level of a burden on interstate commerce is essentially a balancing exercise in which any inconvenience to the national economy must be justified by the state's interest in protecting its own citizens. Prohibition of sales to these purchasers is within the police power of the state. *Presser v. Illinois,* 116 U.S. 252, 265, 6 S.Ct. 580, 29 L.Ed. 615 (1886). Indeed, several states ban one form of firearm, the "Saturday night special," apparently without significant Commerce Clause challenge.[12] *See C.D.M. Prods., Inc. v. City of New York,* 76 Misc.2d 369, 350 N.Y.S.2d 500, 503 (N.Y.Sup.Ct.1973). The federal government also imposes requirements on purchases. It is a violation of

---

11. *See, e.g., City of Cincinnati,* 768 N.E.2d at 1150.

12. Jon S. Vernick & Stephen P. Teret, *A Public Health Approach to Regulating Firearms as Consumer Products,* 148 U. Pa. L.Rev. 1193, 1197 n. 23 (2000).

federal law for a dealer to sell a handgun to a variety of classes of individuals.[13] But federal legislation has expressly denied any intent to preempt state laws regulating guns. 18 U.S.C. 927 (2000).[14] State tort doctrines are equally allowed to thrive as a part of "the law" of a state. Defendants contend that the City's relief would require manufacturers to change their distribution methods nationwide, and therefore constitutes extraterritorial regulation which violates the Commerce Clause. It is true that the City seeks to change how handguns are distributed, but only those handguns that are sold in ·and around Gary. Indiana law requires that no sales be made to felons and some others deemed as significant risks. I.C. § 35–47–2–7(b). Imposing liability for negligent, reckless or intentional facilitation of violations of these regulations that cause harm within the local jurisdiction does no more than state tort law has historically done. To avoid that liability, the defendants need only comply with existing state and federal laws governing gun distribution.

Defendants also cite *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), for their contention that a state regulatory scheme may violate the Commerce Clause. *Edgar* involved a state statute that required ·state approval of a tender offer for a company whose shares were owned across the nation. *Id.* at 627, 102 S.Ct. 2629. Thus Illinois sought to prevent transactions between buyers and sellers, both of whom were outside the forum state. Here, with the possible exception of the City's effort to block internet sales (which could also be locally regulated by using the shipping address of the buyer), all of the requested relief can be accomplished at a local level. At a minimum, the distributors and manufacturers can stop doing business with those few dealers in the Gary area known to be sources of unusually high volumes of illegal sales. Other more tailored forms of relief limited to local impact are presumably also available.

█ It is well established that a state can establish product liability standards in the absence of federal preemption of the area. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 60, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002); *Geier v. Am. Honda Motor Co.*,

---

**13.** Federal law prohibits sales to a person the dealer knows or has reasonable cause to believe is under the age of twenty-one, 18 U.S.C. § 922(b)(2) (2000); a person who has been convicted of, or is under indictment for, a crime punishable by imprisonment for a term exceeding one year, 18 U.S.C. § 922(d)(1); a fugitive from justice, 18 U.S.C. § 922(d)(2); an unlawful user of or a person addicted to a controlled substance, 18 U.S.C. § 922(d)(3); a person who has been adjudged a mental defective, 18 U.S.C. § 922(d)(4); an illegal alien, 18 U.S.C. § 922(d)(5); a person who has been dishonorably discharged from the armed forces, 18 U.S.C. § 922(d)(6) (2003); a person who has renounced his citizenship, 18 U.S.C. § 922(d)(7) (2000); a person subject to a restraining order concerning the harassment, stalking, or threatening of an intimate partner or child, 18 U.S.C. § 922(d)(8); or a person who has been convicted in any court of misdemeanor domestic violence. 18 U.S.C.

§ 922(d)(9). Additionally, state law prohibits dealers from selling a handgun to a person the seller "knows or has reason to believe is ineligible for any reason to purchase or otherwise receive ... a handgun." I.C. § 35–47–2.5–14(b). The state also prohibits sales to minors, convicted felons, children adjudicated delinquent, a drug or alcohol abuser, or a person who is mentally incompetent. I.C. § 35–47–2–7.

**14.** "No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together." 18 U.S.C. § 927.

529 U.S. 861, 886, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). The defendants raise no Second Amendment issue. For purposes of the Commerce Clause, there is no qualitative difference between recognition of the negligence and nuisance claims the City asserts as to handguns and restrictions on any other product deemed dangerous. We also see no difference between local requirements designed to make the product itself more safe and requirements that its distribution be conducted consonant with public intent.

Applying these general principles, we find no Commerce Clause bar to the City's claim. The City seeks to abate the allegedly unreasonably injurious practices of the defendants in the distribution of handguns that find their way into the hands of criminals in Gary. Local safety concerns have been found to justify banning some products altogether. *See, e.g. Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1130 (7th Cir.1995) (spraypaint); *Cohen v. Bredehoeft,* 290 F.Supp. 1001, 1003 (S.D.Tex.1968), *aff'd* 402 F.2d 61 (5th Cir.1968) (fireworks). Certainly where only local retail sales are affected, even an outright ban would not discriminate either formally or in effect against interstate or out of state interests. *Nat'l Paint & Coatings Ass'n,* 45 F.3d at 1132. Accordingly, a "rational basis" grounded in public safety may justify it. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Even if such a ban were to be evaluated under the more stringent balancing of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), its survival of a commerce clause challenge would turn on factual issues resolved at this pleading stage in favor of the plaintiff. In any event, the form of relief the City seeks falls far short of banning handguns. Even under the traditional *Pike* test, whether there are less restrictive means

and proof of the degree of harm alleviated remain issues for trial. They do not justify dismissal of the claim on Commerce Clause grounds.

### C. The City's Right to Assert the Claim

Defendants contend the City cannot sue at all, and even if it can bring some claims, it cannot obtain injunctive relief.

### 1. Authority to Seek an Injunction Based on a Public Nuisance Claim

■ Indiana Code section 32–30–6–7 allows an action to "abate or enjoin a nuisance" to be brought by "the attorney of any city or town in which a nuisance exists." Indiana Code section 32–30–6–8 allows a "nuisance to be enjoined or abated, and damages recovered for the nuisance." Section 7 allows a unit of government to bring an action for abatement or injunction without regard to its status as an injured party. These statutes authorize the City to bring such a claim.

### 2. Statutory Limits on the City's Ability to Regulate Firearms

■ The trial court found Indiana statutes limiting the powers of municipal corporations to bar the City from bringing this lawsuit. First, we do not agree that the filing of this lawsuit violates Indiana Code section 35–47–11–2, which prevents the regulation of firearms by cities. This lawsuit does not seek to implement a regulatory scheme. It seeks redress under existing state law of nuisance and negligence. The manufacturer-defendants contend that judicially fashioned tort remedies may be viewed as a form of regulation. For this proposition they cite cases finding that judicial action may constitute "regulation" for purposes of determining whether a state law of statutory or judiciary origins

impermissibly interferes with interstate commerce. *See, e.g., BMW of N. Am., Inc.,* 517 U.S. at 573 n. 17, 116 S.Ct. 1589; *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 246–47, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Penelas v. Arms Tech., Inc.,* 778 So.2d 1042, 1045 (Fla.Dist. Ct.App.2001). We do not believe this doctrine grounded in federal-state relationships is applicable to interpretation of the state municipal law statute the defendants cite. The same contention of judicial regulation could be leveled at any nuisance claim, and, as noted elsewhere, Indiana statutes expressly authorize the City to seek relief against public nuisances.

In sum, the City seeks redress against certain techniques that are alleged to generate a nuisance. Its lawsuit is no more regulation of firearms than a suit to enjoin any form of nuisance is a regulation of the activity. Unless this form of "regulation" runs afoul of the Commerce Clause, which it does not, it is a well-established form of permissible relief under state law.

### 3. *Limitations on the City's Authority to Obtain Injunctive Relief*

The trial court also found Indiana Code section 36–1–6–4 to bar the City's claim. That section authorizes a municipal corporation to enjoin persons from violating an ordinance regulating the use of property or engaging in conduct without a required license. The trial court accepted the defendant's contention that this section contained an exhaustive list of the circumstances under which the City may seek injunctive relief. We do not agree. First, this section is a part of the chapter entitled "enforcement of ordinances." Here, the City does not seek to enforce an ordinance. Rather the City seeks relief from alleged harm under tort theories. Second, the language of the statute grants a municipal corporation the

power to seek injunctive relief when either of these two events occurs but does not purport to limit a city's injunctive power under other circumstances. Third, if there were any doubt, the public nuisance statute expressly authorizes the City to bring such a claim. I.C. § 32–30–6–7. A statute specifically addressing a subject controls over a generally worded one. *Ross v. State,* 729 N.E.2d 113, 116 (Ind.2000).

### 4. *Geographical Limits on the City's Regulatory Power*

The trial court also cited Indiana Code sections 36–1–4–1 through 18 and held that this lawsuit amounted to an attempt by the City to regulate people, property and activities outside of the City's boundaries. Once again we disagree. It is true that Indiana Code section 36–1–3–9(b) defines the jurisdiction of a City as its corporate boundary, and Indiana Code section 36–1–3–8 expressly prohibits a City from imposing duties upon other political subdivisions. However, once again the controlling point is that the City is seeking redress for harm caused within its geographical boundaries. The fact that some of the actions that allegedly generate the injury take place outside the City does not preclude the suit so long as the City can demonstrate that the defendants contribute to the harms alleged. *See, e.g., City of Chicago,* 271 Ill.Dec. 365, 785 N.E.2d at 31 (allowing public nuisance claims against dealers, manufacturers and distributors outside City limits).

### 5. *The Home Rule Act*

The trial court found Indiana Code sections 36–1–3–1 through 9, commonly referred to as the Home Rule Act, to deny the City the authority to sue. The Home Rule Act grants local governing bodies "all the powers that they need for the effective operation of government as to

local affairs." I.C. § 36–1–3–2. The Act explicitly declares that "[a]ny doubt as to the existence of a power of a unit shall be resolved in favor of its existence." I.C. § 36–1–3–3(b). In view of this provision, the public nuisance statute, which expressly authorizes the City to bring a claim, resolves any doubt. I.C. § 32–30–6–7(b)(2).

### D. *Damages Under the Nuisance Claim*

 In addition to its claim for injunctive relief, the City also seeks damages as a party uniquely injured by the nuisance. In particular, the City points to public costs for the "care and treatment of ... gunshot injuries" and economic injuries in the form of increased spending on law enforcement, emergency rescue services, security at public buildings, pensions, benefits, and jail costs. The City also asserts that the widespread presence of guns in illegal hands results in lower tax revenues and lower property values. In addition to costs imposed by use of lawfully distributed guns, the City claims harm at the time of an unlawful sale in the form of increased costs in tracking down illegal handguns. Indiana Code section 32–30–6–8 explicitly allows monetary damages to be recovered by any successful plaintiff in a nuisance action. This includes the City as well as private parties. To the extent the City can establish its claim for damages as an injured party it has a claim for money damages just as any other injured party.

The City does not claim damage to its property from use of illegally sold guns. Rather, it seeks compensation for various forms of responses to gun use or illegal sales. Some courts have concluded that the difficulty of proof of damages bars a nuisance claim altogether. *Camden County Bd. of Chosen Freeholders v. Beretta USA Corp.*, 273 F.3d 536 (3d Cir.2001); *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001); *People v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 761 N.Y.S.2d 192, 204 (N.Y.App.Div.2003). We believe these holdings are inapplicable here for the simple reason that Indiana statutes explicitly provide for a municipality to bring an action to enjoin or abate a nuisance. Thus, even if money damages are ultimately found to be barred by doctrines of remoteness, proximate cause, or the like, injunctive relief is available.

We respectfully disagree with those jurisdictions that have dismissed a complaint on the ground that money damages are too remote from the activity of some defendants to be recoverable. Related contentions are that administration of such a claim is judicially unmanageable, and that municipal costs are not recoverable. Although the City is authorized to sue for "money damages," we conclude that the limitations on types of damages recoverable under a negligence theory are equally applicable to a nuisance claim. Legislative authorization to sue for money damages carries with it the common law limitations on damages. As explained in Part II.B, the City's claims for damages raise a number of issues and the discussion of damages in Part II.B applies equally to the damages the City claims under its nuisance count. These issues do not warrant dismissal of the complaint, however. It is sufficient here to observe that the complaint alleges the City has incurred damages from the nuisance. This is a conventional tort pleading subject to no requirement of specificity. What form the City's proof will take is currently not before us and we cannot say as a matter of law it cannot establish some items of damage if liability is proven. As set forth in Part II, we agree that there may be major, perhaps insurmountable, obstacles to establishing some or all of the damage items the City cites. But

that is not a basis to dismiss the complaint before discovery has refined these issues and the precise nature of the City's case is known.

### E. *Summary*

In sum, the City alleges that all defendants intentionally and willingly supply the demand for illegal purchase of handguns. The City alleges that the dealer-defendants have participated in straw purchases and other unlawful retail transactions, and that manufacturers and distributors have intentionally ignored these unlawful transactions. The result is a large number of handguns in the hands of persons who present a substantial danger to public safety in the City of Gary. I.C. §§ 35–47–2.5–14, –15. Taken as true, these allegations are sufficient to allege an unreasonable chain of distribution of handguns sufficient to give rise to a public nuisance generated by all defendants.

### II. Negligence

In count II of the complaint the City claims the defendants have acted negligently in the distribution, marketing, and sale of handguns. The factual basis of this claim are substantially the same as those supporting the nuisance claim. In addition, the city alleges that the manufacturers have negligently designed the guns and failed to include proper warnings of the harm they pose.[15] The City further claims it was harmed by these practices

due to the shootings committed in the City, the harm handguns cause its citizens, and the law enforcement and other costs incurred to investigate crimes committed with guns and to investigate illegal handgun sales.

The trial court dismissed the negligence claim on the ground that the defendants owed no duty to the City. The Court of Appeals agreed. *City of Gary v. Smith & Wesson,* 776 N.E.2d 368, 388 (Ind.Ct.App. 2002). For the reasons explained below, we reverse the dismissal of the City's claim for the negligently unlawful sale of handguns.

### A. *Duty of a Custodian of a Gun to Exercise Care*

The elements of a negligence action have long been recited by courts in Indiana and elsewhere as duty, breach, causation and harm. *Estate of Heck v. Stoffer,* 786 N.E.2d 265, 268 (Ind.2003). The Court of Appeals, following *Webb v. Jarvis,* 575 N.E.2d 992 (Ind.1991), viewed the duty issue in terms of the balance of foreseeability, public policy, and the relationship between the parties. Where a duty is already recognized it is to be followed, and we need not turn to a balancing test of factors to determine whether a duty exists. *N. Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 465 (Ind.2003). Here precedent has established that a custodian of firearms owes a duty to act with reason-

---

**15.** Negligent design and failure to warn are typically asserted as product liability actions. Indiana's Product Liability Act allows for actions "brought by a user or consumer . . . for physical harm caused by a product." Ind. Code. § 34–20–1–1 (1998). Although some units of the City may be users or consumers of handguns, the City itself is not a user or consumer in the capacity in which it brings this suit. Accordingly, it presents no claim under the Product Liability Act. The Product

Liability Act applies to claims for negligence in defective products as well as strict liability. I.C. §§ 34–20–2–2, –3. However, the City is not suing for recovery from physical harm, and therefore its negligence claim is not subject to the Act. I.C. § 34–20–1–1. Because the Act does not apply either to authorize or limit the City's claim, the contentions that handguns are defectively designed and accompanied by inadequate warnings are addressed as a part of the City's negligence claim.

able care to see that the weapons do not fall into the hands of people known to be dangerous. As we stated in *Estate of Heck*, "[t]he care required is always reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his act, and is proportionate to it. The greater the danger, the greater the care which must be exercised." 786 N.E.2d 265 at 270 (citing Restatement (Second) of Torts § 298). *Estate of Heck* recognized a duty on the part of an owner of a gun to exercise reasonable care to prevent the weapon from falling into hands known to be dangerous. This same duty applies to the defendants. Each defendant is a custodian and owner of the weapon at the times that defendant possesses it in the chain of distribution. To the extent the defendants argue any injury to the City to be remote from any unlawful sale, that raises the issue of proximate cause discussed in Part II.B.2, but does not negate the existence of a duty on the part of the defendants to act reasonably to avoid injury to anyone, including the City, who is reasonably foreseeably harmed.

Defendants point to legislation regulating the distribution of firearms and argue that compliance with these statutes is sufficient to immunize them from liability. But these same statutes also provide that firearms are not to be available to certain classes of people. Specifically, Indiana Code section 35–47–2–7 prohibits the sale or transfer of ownership of a handgun to a minor, a convicted felon, a drug abuser, an alcohol abuser or a mentally incompetent person. These prohibitions obviously reflect a concern that weapons in the hands of these persons constitute a danger to the public. These are the very groups that the City alleges the defendants knowingly facilitated in their efforts to obtain firearms. We think it clear that these statutes impose on everyone in the chain of distribution a duty not to facilitate ownership of a handgun by one of the identified classes.

## B. *Problems of Causation and Damages*

The City's complaint identifies the damages it seeks as expenses in "trying to abate the nuisance" and damages "caused by the defendants' wrongful design, manufacture, marketing advertising, distribution and sale of handguns." The specific items identified in the complaint are "police and law enforcement services, additional security in and upon public facilities, emergency medical services, pension benefits, disability benefits, workers' compensation benefits, and losses in tax revenues and property values."

### 1. *Recovery of Municipal Costs*

Defendants first argue that the items as damages the City seeks are not recoverable as a matter of law because they fall under the category of municipal costs incurred in the course of ordinary governmental functions. Although there is no Indiana precedent, defendants contend these items are not recoverable at common law. Defendants cite *Dist. of Col. v. Air Florida, Inc.*, 750 F.2d 1077, 1080 (D.C.Cir.1984), and *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323–24 (9th Cir.1983), for the proposition that activities carried on by government are not components of compensable damages. The defendants point out that the items cited by the City are all in the general category of additional services—investigation, response to crimes, treatment of victims, services to children, etc.—of the type government provides to the general public.

The doctrine that a tortfeasor is not liable for the cost of municipal services in

responding to an accident has been addressed only infrequently. Then–Judge Kennedy explained it as based on the nature of the entity seeking recovery, not on remoteness of the damage item from the tortfeasor's act. *City of Flagstaff,* 719 F.2d at 324. Thus, the costs of responding to a single accident or fire may be quantifiable, at least in part, and may satisfy ordinary requirements of proximate cause. The municipal costs doctrine would nevertheless deny recovery on the basis in part that all expect the government to provide emergency services, and if any change is to come in that doctrine it should originate with the legislature. *Id.*

The damages the City seeks for the most part are in the nature of costs of responses to incidents of gun use. There is an inherent issue in any attempt to recover cost of municipal government in responding to even a single incident such as an accident. Even if it is appropriate to charge the arsonist with cost of a run by the fire department, one can fairly debate to what extent these are recoverable. The municipality incurs direct costs (gas for the fire truck, the water bill, etc.), allocated costs of preparedness that would be incurred and are not directly attributable to the incident (depreciation on the firehouse, salaries of administrative personnel, etc.), and some costs that are arguably in either category (salaries of the firemen who respond). In addition to these issues, the City's claims here raise a second level of complexity because they also present the broader issue of identifying the costs attributable to whole classes of incidents, and then allocating those costs among the various contributing factors, only one of which is the acts of the alleged tortfeasor. Despite these complexities there may be merit in some claims by the City for damages to its property from the use of an illegally purchased weapon, and municipal costs may be recoverable under conven-

tional tort disputes in some circumstances. The City's broad description of its damages suggests an aggregation of disparate claims for response costs under generalized allegations. It appears to include many fact patterns that presumably do not support a claim for damages. As explained below, these and other issues may prevent recovery of some claimed items of damage, but the mere fact that the City provides services as part of its governmental function does not render the costs of those services unrecoverable as a matter of law. We do not agree that the City, as a governmental entity, is necessarily disabled from recovering costs from tortious activity. Rather, we agree with those courts that have rejected the municipal cost doctrine as a complete bar to recovery. *See James v. Arms Tech., Inc.,* 359 N.J.Super. 291, 820 A.2d 27, 49 (App.Div. 2003); *Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136, 1149 (2002).

2. *Proximate Cause and Comparative Fault*

 The defendants point out that at the time a gun is used in a crime it is no longer in the control of any defendant. Moreover, a wide variety of conditions, many involving no fault of any defendant, can lead to use of a firearm in some unlawful manner. Under standard negligence doctrine, in order for a defendant to be liable for a plaintiff's injury, the defendant's act or omission must be deemed to be a proximate cause of that injury. *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630, 635 (Ind.1991), *citing Prosser and Keeton on the Law of Torts* § 41 at 263–66 (5th ed.1984). Proximate cause in Indiana negligence law has two aspects. The first— causation in fact—is a factual inquiry for the jury. If the injury would not have occurred without the defendant's negligent

act or omission, there is causation in fact. *Cowe,* 575 N.E.2d at 635. A second component of proximate cause is the scope of liability. That issue, which is also for the trier of fact, turns largely on whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Bader v. Johnson,* 732 N.E.2d 1212, 1218 (Ind.2000). Under this doctrine, liability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission. *Havert v. Caldwell,* 452 N.E.2d 154, 158 (Ind.1983); *Control Techniques, Inc. v. Johnson,* 762 N.E.2d 104, 108 (Ind.2002). Under comparative fault, the trier of fact can allocate fault to multiple contributing factors based on their relative factual causation, relative culpability, or some combination of both. *Control Techniques, Inc.,* 762 N.E.2d at 109; I.C. § 34–51–2–8.

A crime involving the use of a gun may be attributable in part to an unlawful sale, but it also requires an act on the part of the criminal. Among the defendants, the retailers are the closest link in the causal chain to the criminal act. But even these dealers may not be the sole cause of the injuries from the illegal use of the weapon, and in many cases will not bear any share of the fault. As illustrated by the statistics the City cites in its complaint, a significant amount of time often passes between the sale of a handgun and the time a crime is committed using the weapon.[16] A wide variety of intervening circumstances may contribute to the ultimate unlawful use. And of course lawfully purchased handguns are also used in crimes, so any at-tempt to recover costs attributable to unlawfully distributed weapons must address that fact.

■ We agree with the trial court that legislative policy permitting lawful distribution of guns is relevant here. As a matter of law, in the absence of other facts, it is not a natural and probable consequence of the lawful sale of a handgun that the weapon will be used in a crime. In this procedural posture the City cites no specific transaction in which its damages are traceable to use of a gun obtained in an unlawful sale. The City's general description of its damages would presumably embrace a vast number of different unspecified claims arising from a variety of widely different circumstances. Much of the costs that are within the broad terms of the City's complaint are undoubtedly attributable to use of lawfully distributed guns. Even an unlawfully sold weapon may nevertheless be acquired by a licensed owner before its use in a crime. In some cases the fault allocated to the user may overwhelm or even eliminate fault of the seller. And so on. Because of these many variables, any particular crime may not be attributable to an unlawful sale at all. And even if an unlawful sale did contribute in part to some injuries, the relationship of each defendant to the sale may vary, and the vast majority of defendants will have no relationship to the transaction that placed the gun in the hands of its user.

The conclusory allegations of the complaint leave much unanswered. For the reasons cited, there may be substantial barriers to recovery of any or all of these damages. However at this pleading stage we have nothing more than the City's allegation that it has incurred damages in

---

**16.** According to the City, Gary has the fastest time-to-crime of any major urban center at 2.9 years.

these general categories. There may indeed be substantial issues of proximate cause, or, as some courts put it, "remoteness" of damage. *City of Cincinnati,* 768 N.E.2d at 1144; *People v. Sturm, Ruger & Co.,* 309 A.D.2d 91, 761 N.Y.S.2d 192, 197 (N.Y.App.Div.2003). However, we cannot say as a matter of law that no items are recoverable. Resolution of these issues must await the proof offered to substantiate each claimed item. Here we have bald allegations of liability and a claim of resulting damages. That is sufficient to state a claim. Whether the claim can be substantiated is an issue for another day.

### 3. *Market Share Liability*

■ The City seeks to overcome difficulties in proof of damages by relying on a "market share" theory. This approach to allocation of liability has not been adopted in Indiana. To the extent "market share" has been applied, it has been used as a means of allocating damages among a group of defendants when it is known that one of them is liable to the plaintiff, but it cannot be established which of them caused any particular plaintiff's injury. For example, in the leading case, *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), one of the many manufacturers of a fungible product was known to be the source of the product alleged to cause the plaintiff's injuries, but there was no means to identify which of the manufacturers produced the particular product that injured a specific plaintiff. In this circumstance, some jurisdictions have allowed recovery against the group of potential sources of the defective product, and allocated the damages in proportion to each manufacturers' sales in the relevant time period. Where market share theory has been adopted, the defendants denied any causation, but there was no claim that the injury was solely attributable to other wrongful acts aside from the product defect. Here, in contrast, many injuries from crimes involving guns are plainly not attributable in any respect to any unlawful sale of the weapon, and all are caused at least partly by substantial wrongful conduct by non-parties. Whatever the merits of "market share" in other contexts, we do not believe it is properly applied in this situation involving such a wide mix of lawful and unlawful conditions as well as many potentially intervening acts by non-parties.

### 4. *Negligence Per Se*

■ The City asserts negligence per se, arising from an unlawful sale and cites *Rubin v. Johnson,* 550 N.E.2d 324 (Ind.Ct.App.1990), for the proposition that the criminal use of a firearm does not constitute an intervening cause. Under comparative fault, the City is correct that a subsequent misuse of the gun does not necessarily extinguish liability of one who negligently furnished it. *Estate of Heck,* 786 N.E.2d at 271; *Control Techniques, Inc.,* 762 N.E.2d at 108. The problem with the City's claim, however, is not a failure to allege negligence. Rather it is failure to identify any common relationship between the alleged acts of negligence and the various injuries from criminal use of guns. Negligence per se is a doctrine that supplies liability, but does not embrace damages. In short, to the extent the City seeks to recover damages it must do so by proof of factual causation, subject to comparative fault and proximate cause, just as any other negligence claim. Those issues remain for trial.

### 5. *Damages for Harm Occurring at the Time of Sale*

■ The City also seeks to recover for the harm caused by the negligent sale of handguns independently from the harm caused by the use of handguns. This al-

leged injury removes several links from the causal chain needed to establish harm from the use of the gun. In addition to the costs in investigating and attempting to prevent crimes committed with handguns, the City also seeks recovery for the harm caused directly to it by the acts of illegal handgun sales. Examples of these damages are costs of investigations of illegal sales and services to juveniles who posses firearms.

■ The City claims that the costs it seeks to recover are analogous to cleanup costs of a toxic waste spill which are recoverable even in jurisdictions that follow the no-recovery-of-municipal-costs rule. *See City of Flagstaff,* 719 F.2d at 324. Certainly a unit of government has a civil remedy for injury to its property. *City of Marion v. Taylor,* 785 N.E.2d 663, 664–65 (Ind.Ct.App.2003) (suing for damages to stoplight). Cleanup costs are often in the nature of abatement costs. They restore the situation to the pre-nuisance status. The damage items the City identifies as arising from the sales are generally additional police efforts and services to juvenile buyers. These may present insurpassable issues of causation. Claims with fewer intervening factors have been regarded as simply too complex to permit proof of damages. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, (1977) (rejecting antitrust price fixing damages sought by buyers from customers of the price fixers as too speculative because it would require proof of the extent to which the inflated price would be passed on to buyers in the resale market); *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp., et al.,* 123 F.Supp.2d 245, 263 (D.N.J.2000) (applying reasoning of *Illinois Brick* to proximate cause in municipal handgun case). However, once again we are presented with a motion to dismiss a conclusory alle-gation of a complaint. Whether the proof at trial will be sufficient to overcome these issues remains to be seen.

### 6. *Injunctive Relief*

■ For the reasons given, we agree that proof of damages from any specific use of an unlawfully sold weapon, or from the sale itself, may turn out to be so inextricably intertwined with other factors that as a matter of law the City may have difficulty in establishing a claim for money damages. However, precisely because there may be no effective damage remedy we conclude that the City has stated a claim for injunctive relief. Tort law has historically viewed injunctive relief as available only if there is no adequate remedy at law, i.e. if there is no appropriate money damage award to compensate the victim. Dobbs, *Law of Remedies,* § 2.5, at 123, (2d ed.1993).

■ We think the City's negligence claim for injunctive relief remains viable to the extent it alleges injury caused by the negligent sale of handguns. The City has stated facts that, if proven, support the conclusion that it has incurred some expenses as the result of negligent conduct on the part of the defendants and will incur more in the future. Although the allocation and evaluation of monetary damages may prove to be unquantifiable, proof of some unknown but material additional cost incurred by the plaintiff is sufficient for injunctive relief. *Law of Remedies,* § 2.5(2) at 131 and § 5.7(2) at 763. Injunctive relief is not as speculative as monetary damages and does not involve the apportionment problems that come with a reward of monetary damages. Even if the City ultimately fails to establishing its action for damages, an equitable action for injunctive relief may still lie. *NAACP v. AcuSport, Inc.,* 271 F.Supp.2d 435, 493 (E.D.N.Y.2003). This is simply an applica-

tion of the widely accepted doctrine that injunctive relief is available when a party suffers economic harm that cannot necessarily be quantified. *See Barlow v. Sipes*, 744 N.E.2d 1, 7, 13 (Ind.Ct.App.2001) (in a tort case involving intentional interference with a business relationship and defamation, injunctive relief was necessary "because money damages cannot be calculated with any predictability or certainty"); *Daugherty v. Allen*, 729 N.E.2d 228, 235 (Ind.Ct.App.2000) (injunctive relief is not appropriate when monetary damages make a party whole, but injunctive relief is available when monetary damages cannot be adequately awarded); *Robert's Hair Designers v. Pearson*, 780 N.E.2d 858, 865 (Ind.Ct.App.2002) (injunctive relief available to enforce non-competition agreement even if economic loss was not quantifiable).

### 7. *Deceptive Advertising Claims*

██ The City also asserts claims of misleading and deceptive advertising and marketing of guns. This is alleged in support of both the nuisance and negligence claims. Specifically, the City alleges that guns are presented as adding to a homeowner's safety when in fact the opposite is true. Like Count III, discussed below, these allegations appear to apply equally to lawfully and unlawfully distributed guns. The City alleges that it incurs additional costs for treatment of both intentional and accidental gunshot injuries as a result of the increased placement of guns produced by the deceptive marketing practices. The City attributes some of its incurred municipal costs to these factors. For the same reasons applicable to the allegation of contributing to unlawful sales practices, we agree that these claims, if proven, state a claim for injunctive relief based on an action for public nuisance and negligence theories. The money damages claim may suffer from the same complexity and multiplicity of factual allegations that

could bar damages from other allegations, but for the reasons already given, these issues do not warrant dismissal of the complaint.

### III. Negligent Design Claim

██ The City asserts a negligent design claim in Count III against the manufacturers alleging the manufacturers "were negligent in designing the handguns in a manner such that the defendants foresaw or should have foreseen that the products would pose unreasonable risks of harm to the citizens of Gary who are unaware of the dangers of a firearm or untrained in the use of handguns, or who are minors or mentally impaired persons." The City alleges that design of the manufacturers products is defective for lack of adequate safety devices including, but not limited to, devices that prevent handguns from being fired by unauthorized users, devices increasing the amount of pressure necessary to activate the trigger, devices alerting the users that a round was in the chamber, devices that prevent the firearm from firing when the magazine is removed, and devices to inhibit unlawful use by prohibited or unauthorized users. The City also claims that the manufacturer defendants have knowingly and intentionally colluded with each other to adhere to unsafe industry customs regarding the design of handguns.

These claims presumably apply equally to guns that are distributed lawfully. To the extent either defective design or deceptive marketing of guns contributes to accidental injuries, the claim for money damages suffers from the same problems of complexity and potential remoteness of causal connection that may bar damages recovery for the defendant's alleged contribution to unlawful sales. The allegation of concerted action to withhold design improvements from the marketplace states a

claim of wrongful conduct. The City is not a purchaser. It has no direct claim under statutory or common law theories. *See, e.g. Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746–48, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). But to the extent these actions constitute an unreasonable interference with a public right, the City has alleged a claim for a public nuisance. Whether these alleged design defects are unreasonable and the extent to which they contribute to the harm alleged are matters for trial. Similarly, the availability of relief appropriate to any unreasonable interference, given that the defendant's products are lawful and the public has a right to acquire them may present substantial obstacles to the City's claim. However, at this pleading stage we conclude that the City has stated a claim for relief.

### IV. Jurisdiction and Standing

 Two Dealers, Blythe's Sports Shop, Inc. and Jack's Loan, Inc., argue that this case is not justiciable for lack of a case or controversy. These dealers accurately describe federal case or controversy requirements, but there is no such jurisdictional limitation on Indiana state courts. *See Cincinnati Ins. Co. v. Wills,* 717 N.E.2d 151, 154 n. 2 (Ind.1999). Indiana does require that plaintiffs meet the standing requirement recently explained as a showing that they have a "stake in the outcome of the litigation and ... that they have suffered or were in immediate danger of suffering a direct injury as a result of the complained-of conduct." *State ex rel. Cittadine v. Ind. Dep't of Transp.,* 790 N.E.2d 978, 979 (Ind.2003). The City has met this requirement by alleging it was financially injured through the sale and use of negligently distributed firearms and by alleging a nuisance within its borders caused by the defendants.

### V. The Admissibility of the Settlement Agreement

 When the City filed its First Amended Complaint, the City attached a settlement agreement allegedly entered into by Smith & Wesson, one of the manufacturer-defendants. The trial court granted the defendant's motion to strike the agreement from the complaint and the Court of Appeals affirmed that ruling. The trial court pointed out that Smith & Wesson is still a party to this litigation, and found the City had made no showing that the agreement was ever entered into. The trial court also found the agreement to be irrelevant and in violation of Rule of Evidence 408 as a purported agreement of settlement and compromise. The City claims the settlement agreement is relevant because it shows the feasibility of some of the protections the gun manufactures could employ to lessen the harm. Smith & Wesson does not address this on appeal.

We think the agreement was properly ordered stricken from the complaint but conclude that it is premature to address the admissibility of this purported settlement agreement at this stage. No party included a copy of the Motion to Strike in its Appendix, and no party refers to any factual affidavit either supporting or opposing the motion to strike, so at this stage of the proceedings, we accept the City's factual assertions as true. Assuming this agreement was entered into, it forms no essential part of the complaint. It is at most evidence supporting one allegation of the complaint. On its face, there may be issues precluding the admission of the agreement into evidence, at least for some purposes. But whether any part of the agreement is admissible in evidence, and for what purpose, is a matter to be addressed at trial.

## Conclusion

We hold that the City may proceed on both the public nuisance claim and negligence claims against all defendants. The City may also pursue its negligent design claim against the manufacturer defendants. The judgment of the trial court is reversed. This case is remanded for further proceedings.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.